Thank you for the opportunity to address the court this morning. Remember to try to keep your voice up because we have a we have a remote. I've been reminded by Judge Gould about this. I'll remind you. Let me try. Is that a little bit better for the volume? Yes. Thank you. Great. Thank you. Thankfully, we're both pretty tall, so we can work with the same podium, hopefully. I'd like to reserve about five minutes for my rebuttal time. So I'll try to work within 10 minutes. Keep track of the clock and I'll try to remind you when to get close. Thank you very much. So just at the outset, I would like to focus on what I believe are some of the factual disputes that are existing in the record here, which would have precluded should have precluded summary judgment at the district court level, both on the constitutional violation and on the issue of qualified immunity. Factual issues that I believe that the district court either improperly accepted a position set forth by the officers or either did not acknowledge the dispute that existed. And I see primarily three areas where this exists. The first would be the statements that Mr. Andrich was engaging in active, aggressive, physical resistance during this exchange. I think that's fairly close to a direct quote from the district court's order. And there was evidence in the record on summary judgment that that was just not true or at the very least a disputed fact that a jury. Tell me what evidence you think created that fact issue. Yeah. So, first of all, there's a third party witness, which would have been the manager at the hotel at the time who testified his deposition or excerpts of his deposition or in the record that Mr. Andrich was not throwing any punches, not actively. Actually, he didn't testify that he was not throwing any punches. His testimony was I didn't see him throwing any punches, but that he was tossing the officers around like ragdolls. So I'm trying to figure out how that creates a material fact dispute about whether Mr. Andrich was engaging in active resistance. Yeah. And he also testified that Mr. Andrich had his back to the officers or was on the ground and that he never faced forward to him. So I think that the testimony from him is a little contradictory on that point as to whether he was, you know, tossing them like ragdolls, because in my mind, I don't know that you can do that if you're on the ground. Well, but we're talking about a as I understand the officer's testimony. It was we grabbed him and eventually took him to the ground. And I thought the testimony from the. Hotel manager related to the tussle that that occurred. And so I'm trying to figure out why it creates a fact issue about whether at some point Mr. Andrich was actively resisting. You don't dispute that, do you? I do not dispute that it's a factual issue. No, no. Do you dispute that the evidence that there's no contrary evidence to the officer's testimony that at some point he was actively resisting? Because we the only the only testimony you cite that you think creates a fact dispute is from someone who says he was tossing the officers around like ragdolls. That strikes me as active resistance. Well, that's not the only evidence either. I mean, the fact that Mr. Andrich had completely clean nails at his autopsy tends to dispute the fact that he was engaged in any physical altercation with the officers. And he would have had to have tussled with them without the use of his hands, probably in that instance. So, you know, I do think it creates a factual dispute as to whether there was a wild melee. As I think the quote from the district court's opinion was as to whether the especially the extent of the force was appropriate in this situation. I mean, you're talking about a factual situation where Officer Costas landed between 12 and 14 closed fist strikes and Mr. Andrich's face was bloodied. So, you know, you really have to take the facts balancing as to whether the in the totality of the forced use was acceptable based on the amount of resistance that was being presented. So even if you accept the fact that there was some resistance that can be pointed to in the record, it has to be proportional to the the the force has to be proportional to effectuate the lawful purpose. And the amount of force that was used is excessive to the goal that they were trying to reach, which would be to detain Mr. Andrich. Are you separating out the two incidences, the punching and the melee, as you talked about, and the shooting? Is that is that why? Because clearly in the shooting aspect, he was not compliant. He was walking away from the officers. He was like moving his hands away, refusing to give his hands up to the officer. In the video there and the third party witness does testify to the fact that he was attempting to kind of push the hands. I think that was what the third party witnesses testimony was to that effect. But yes, I do. To answer your question directly, I do separate those two events out. I think there's a time difference between those two events. There's space between those two events. And so it really was the interaction at the hotel. And then they the officers and Mr. Andrich separate and then are met back up again. So I do consider those. So in your view, could there be qualified immunity for the shooting, but not for the previous events? I think that that's a possible outcome. That's not the one that I would argue. Obviously, it's not the one you want. I think that that is it's legally possible, yes, to find that there's no qualified immunity, a constitutional violation as to the initial interaction and and not for the shooting or vice versa. I mean, each one needs to be analyzed on its own, on its own facts. Can you address the tasing? Yes, I'd be happy to do that. Normally we see the opposite argument in these cases, which is that you should have used non deadly force before you use deadly force. Yes. And they did here and it didn't work. So why did they violate his constitutional rights with the tase? Yeah, because, well, the court has acknowledged that the use of a taser is is a significant amount of force. I mean, it definitely impacts a person very physically. And so it in order to have a taser deployment, there does need to be some type of eminent threat to safety. It cannot be deployed when that element doesn't exist. And in this case, the evidence is pretty clear that Mr. Andrich was not at that point engaging in any physical interaction with the officers. He was separated from them and in fact, moving away from them. But isn't the case, however, one characterizes the very initial confrontation. We do have a circumstance where it seems undisputed. There was an altercation. Mr. Mr. Andrich was resisting in some way because the only neutral witness says he was tossing the officers around like rag dolls. They couldn't handcuff him and he was leaving. If those are all undisputed facts, and I think they are, why isn't the use of non deadly force like a taser justified? Again, the force, the same argument would apply. The amount of force that's used in order to achieve the lawful purpose needs to be reasonable based on what is being presented. So in this case, Mr. Andrich is not presenting an immediate threat to anybody. They're not in a physical altercation. There's nobody else around him. He's moving away at a relatively slow pace. They can now there's a lot of officers who are converging into this area. They've already called an air support on the canine units. There's a lot of other options, less intrusive, less forceful that they could have now deployed in this situation, giving the facts that are presented to them in that moment. So going straight to a taser, which is an excessive amount of force, given that factual scenario is excessive force. Can I ask you to focus on the qualified immunity issue for a moment and. Take all the facts in the light most favorable to Mr. Andrich. What case do you think clearly establishes that the officers case or cases do you think clearly establishes that the officers conduct was unconstitutional? Is your question specific to the taser incident or would you like me to address all of the. Well, I think as to any of them, I look, I must say in advance, I've looked at the cases that you cited and they all seem. I know you'd have to don't have to be exactly on point, but some of them are cases where somebody is providing no resistance. He's cooperative. He's not fleeing. So I'm trying to figure out which case you think clearly establishes as to any of the elements. Yeah, so I'll go through them, I think, for the I'll call it the initial interaction, since that's kind of the terminology we've been using at the hotel. I would focus specifically on Blankenhorn. I think that's the most factually similar case. That's the one where there is, as you point out, some level of resistance present in that subject that was found in that case. And the officer engaged in several head strikes to the face and body, I will note, fewer than present in this case. And in that case, qualified immunity was found not to exist. And so that's a case in which you have a very similar factual presentation with respect to the victim and less force by the officers. So I think Blankenhorn. I guess there's there's two issues on Blankenhorn I'd like you to address, if you would. Sure. One is it there seems to be at least evidence in that case that the plaintiff is cooperating. And second, there's this court seems to stress that they're the officers never attempted to handcuff him. Does that make a difference? I think I think I would quibble with you on whether Blankenhorn was cooperating. I think that there was at least a point in that case where the evidence showed that he was resisting. And I think that was the whole argument on behalf of the officers in that case as to why their head strikes were appropriate. I think it wasn't there a fact issue about whether or not he had ceased resisting at the point when the head strikes occurred. I think there was a factual dispute as to that's right when he ceased resisting. I don't think there was a factual dispute in that case as the fact that he was at some point. So in your case, is there is there evidence about. When your client ceased resisting, there is evidence that he resisted at some point. Is there evidence that he was not resisting prior to the strikes or that he wasn't? Well, yeah, I mean, I think that the same evidence, especially if you're kind of moving through the. Yeah, because that's the way you've done it. Yeah. So I think moving through that interaction specifically, yes, there is a moment where Mr. Andrich is, I think, by the officer's own testimony or moving away from them, which is when they decide to move into using their tasers. So he's he stops resisting at some point during that interaction at the hotel. I think it is disputed as to precisely that moment, which is a factual determination that's going to happen. I was trying to focus on the punches, if you will. It seems to me on this record, they seem to have occurred after resistance to being apprehended was given. They may have been excessive, but I'm just trying to figure out how he was. He's still resisting, at least at that point. Yeah, I think the record is unclear as to what point during that exchange, during those 14 head and body strikes and the knee strikes, when the resistance would stop. So there's I think that it's just an unclear record. I think there's going to have to be a factual determination as to the extent of Mr. Andrich's resistance during that period, whether those strikes were excessive or not, whether Mr. Andrich stopped resisting at some point during that exchange. That is the part of the record that requires factual determination by a jury. You're down to a couple of minutes and a half. And I know you wanted time for rebuttals. Can I ask one quick question? We'll put some time. Yeah, sorry. So at some point, Peters, Officer Peters told Cossus to stop punching Andrich, correct? And is there any allegation that that Officer Peters was telling him to stop because he thought the punches were excessive? Or was it did he tell him to stop punching because he was about to deploy his taser? I think. Or is that a factual dispute? Are you arguing one way or the other? I think that it's a factual dispute as to the meaning of that and what Cossus accepted as the meaning of that. Thank you. And I will put some time back on the clock for you. I want to correct the statement I made. I think the office hotel manager said Andrich exhibited superhuman strength. And it was the officer who said he was tossing him around like ragdolls. Yes. And actually, I'm glad you brought up the superhuman strength point because I did want to point out that type of comment usually comes out in cases where we later see, you know, positive toxicology screens. And I will point out that Mr. Andrich's toxicology screen came back completely negative. Thank you. And as I said, we'll give you some extra time for rebuttal. Thank you very much. May it please the court. Christina Retz on behalf of officers Cossus, Peters and the city of Phoenix. I want to key in on the question that the court asked about qualified immunity and what cases clearly establishes the law in this situation. And first point out that we do not have a case that segregates out these two incidents in the way that the plaintiff has argued. This is a very short period of time with a foot pursuit that is continuing after a very aggressive action. That is documented by Mr. Dickerman, a third party witness who at the hotel had called multiple times to 911 and had barricaded himself and other people inside a laundry room. He then watched and testified that he saw the struggle. It was a melee. He could not believe that the officers could not get this gentleman under control and that the taser was deployed and had no effect whatsoever. So we have two taser applications that don't have any effect. We have officers who are trying to use lower levels of force to get a subject into custody who is very clearly resisting and struggling. There is no evidence in the record to dispute the officer's contention that the suspect also reached for Officer Peter's duty belt, which is the triggering event for the punches at issue. Can I ask you a more general question here? I'm not sure it's dispositive of the case. But looking at this case, what's troublesome from 30,000 feet and the officers were not at 30,000 feet, I understand that, is that this is a trespass. It's a call about a trespassing violation. And the defendant, if you will, the plaintiff in the case, the decedent, while he's not cooperative, is leaving. They get to him in the parking lot and he doesn't want to stay. He wants to leave. And at the end of this call for a trespassing misdemeanor violation, I suspect we have a dead person. It's disturbing in a large sense to see the amount of force that ends up getting used in a case for a relatively minor crime. Could you respond to that? Yes, Your Honor. I think you have to back up to the night before and the information known to the officers and the attempts that they gave to this gentleman to leave. So the night before, these officers are aware that they had been out and there had been a criminal damage call and a trespass the night before. And then when Mr. Andrich left the first time, Officer Peters and Costas encountered him away from the hotel and took that stance. They said, OK, you can go. Just please leave. Don't come back to the hotel. And in response, he said, fuck you. I'm not going to do what you tell me. But it appeared as if he was walking to the other side of the road. He was going to leave the vicinity. And that would have resolved the issue, except for the fact that he came back to the hotel when he had been trespassed and he had been notified by the officers that he should not go back to the hotel. This was the next day, correct? The next day. So he was given the opportunity the next day to leave and simply walk away. He did not. He went back into the hotel. The call originally went out that he was in the hotel with cops stabbing the cops with an unknown object. So you're getting additional information here other than it just being a mere trespasser. So you have the officers trying to use alternatives before you get to the point of the deadly force in this circumstance. Officer Peters tries to get him out of the lobby, away from the person who is sitting there who has not been locked in with Mr. Dickerman. He takes him out and that's when the struggle ensues with Mr. Dickerman saying there's a substantial struggle. Does the initial encounter occurs inside the lobby? Yes. But the violence, if you will, the tussle, doesn't begin until we get into the parking lot. That's correct. And there's video of Officer Peters going into the lobby and asking that Mr. Andridge go outside with him. And then you have the situation of him holding two cups of hot coffee. And they don't know his intentions. And at this point they're going to detain him, which then as they try to detain him and he struggles, this turns into this situation of resisting arrest. And then ultimately, unfortunately, lends to him having a dangler handcuff. And this is rush hour traffic. This is 7 a.m. on Osborne Road by Central. There are open-air shopping malls, much like the Liberty case, where the court, the Ninth Circuit, affirmed summary judgment with a person under similar circumstances. Can you tell me a little bit more about when Peters told Costas to stop punching? Is that – you can defer two ways. Like he's saying stop punching, you're using excessive force, or stop punching, I'm about to deploy my taser. Is there any testimony one way or another to show which inference we should go with? Yes. The testimony is that it was not working to gain control over – The punching. The punching was not working because Officer Costas is 5'7 and 145 pounds. He's a very small man, and it is very clear from the disparity in the video that it was not having any effect. It was not getting to the point where it was taking him into custody. So the testimony from both officers is that the understanding was, hey, take a step back so we can try to use a different level of force and try something different. So they tried the taser, and as Mr. Dickerman explains, it doesn't do anything. And then they try again, even though the first time it seemingly does nothing. And now we have a problem because he's not gotten into custody by these struggles. So while it is argued that it's excessive force, it has not worked. None of this has worked. An intermediate level of force, a taser might be if it actually has some effect. But we have no evidence – That's an interesting argument. Do we measure excessive force by whether or not it's successful? I think you have to because if an officer – So if you haven't – if whatever level of force you've used is not sufficient to detain the arrestee, then it can't be excessive. And it would be supported by the Marquez decision, which involved a taser download that showed 122 seconds of activation from a taser with 22 trigger pulls. And the Ninth Circuit carefully analyzed which of those trigger pulls actually seemed to have an effect and be delivered to. So simply because the device is deployed does not mean that it works, nor does it mean that it has delivered any electricity to the person. Because they could be walking away, the leads could be broken. Clearly for the second taser, we know it did not do anything. He didn't stop. He just kept going. And at this point, he's not merely walking away. He has a dangling handcuff. So now you have him weaponized. You have a struggle. He doesn't submit to officers, which then increases their concern for the community because of the fact that he has not submitted to law enforcement. So now you have a person who you had the CIT team come out the night before. They did not enter the room because they did not want to provoke a shooting. And you start adding this up to give and inform the officer that this is a problem with a person who has the handcuff. Witness McGee is testifying that they are in close proximity to one another. The hand swatting is occurring the entire time by Andrew trying to push him away. And then like Scott B. Harris, we have a video. Yeah, so that's my question. I looked at the video. It does seem a little bit of a dispute of fact whether or not his hand swatting was aggressive or just like trying to get away. I think there are two separate hand swattings, so I want to be clear about those two separations. Witness McGee testified that the hand swatting happened before the shooting. So there's hand swatting. I'm talking about the video. Yeah, so before the video. Oh, okay. So the hand swatting occurs before the video, and then Officer Costis distinguishes that hand swatting from the raised arm that comes. And we know for a fact that Mr. Andridge is also facing the officer because he is shot in the chest. There is no dispute about that. So while there is a pole that blocks a portion of it, you can see the relative distances. You can see as he comes around that that handcuff has now been threaded like a claw. It's not a dangler, just loose. It has been maneuvered into a weapon, and you can see the glint of the steel as he comes around and up. And Officer Costis delivers one shot to stop that threat. He does not unload his firearm, and he stops shooting when he turns away, which also, I would submit, shows reasonableness. Yeah, I think that makes – I'm just saying you could infer from the video that he was trying to push him away, not be aggressive towards the officer. So the differences in testimony show that before he had not used the handcuffs. So as they had advanced across the street, there are multiple videos, one of which is them running across the street through traffic with Officer Costis in pursuit by foot. And that is what precedes the videos with the witness testified as to just the swatting, not with a handcuff. So then the situation changes in the nine seconds of the video where he has, at this point, maneuvered the handcuff. He has taken another step apart from swatting, and now he has maneuvered the handcuff into a weapon. So I want to focus on this for a second because I looked at the video also. He had separated himself at this point from the pursuing officer. He was six to eight to ten feet away, so forget what the witnesses say, but at least six feet away. Yes, and based on the video, it appears to actually be closer than that. I'm not focusing on the distance for the moment. Focusing on the separation. How did the separation occur? Fleeing and running away. Was he running at this point? He had run across the street and was running down the sidewalk. But again, I'm focusing on the issue that Judge Bumate raised. At some point, they were together. Yes. And he swatted the hand away, according to the testimony. And there were various times when the distances closed. By the time the shooting occurred, and we have a little bit of a—the video doesn't help us at some point because there's a traffic pole or whatever blocking the way. He's now separated by whatever distance it is. Do we know how he separates at that point? Is he running away? Is he walking away? Has the officer just stopped? Can we tell? They're simultaneously moving in concert with one another. Okay. So there are points where at one point before the video, Officer Costas testifies that he tried to close the gap to tackle him, but then he saw the handcuff. And he knew that he could not do that because of the handcuff, which is somewhat similar to the Reynolds case, which is cited in Hayes, which is relied upon by the plaintiff as a differentiating case. The Hayes case, which they cite to as clearly established law, was actually a case that involved California law, but the court looked to Ninth Circuit decisions and used Hayes as a distinguishing— Hayes used Reynolds as a distinguishing case where this was a guy at a gas station who had a knife. The officer tackled him to the ground and had his gun actually up against the neck of the suspect. And the suspect made a move with his gun and he shot him in the neck. Can I ask you to go back to where your friend began? And I'm trying to figure out if there are truly any material fact disputes in this case. Tell me, deal with the issues that she raises about where she thinks there are fact disputes. And I take it the first one is whether or not force was used before resistance was shown. We don't see that as a fact dispute, Your Honor, because the testimony of Mr. Dickerman is that it was a struggle from the very get-go. He's the hotel manager. He's the hotel manager, so we have an independent third party who corroborates what the officers say. I take it if there was an issue about who threw the first punch, Dickerman's testimony might somehow create a dispute because he says, I couldn't see punching. Exactly. And the district court didn't credit at all the officer's testimony that the suspect, Mr. Andridge, was punching. In fact, it excluded that from its analysis. The other place in the sequence where I think a contention is made that there's a fact issue occurs at the very end because the video is not conclusive. But does the video create a fact issue? No, I don't believe it does, Your Honor, because what you can see from the video both corroborates Officer Costas' testimony and it is key in critical respects that can't be disputed. So while the poll is blocking a portion of it, we know the proximity between the two of them. We know that Mr. Andridge was facing Officer Costas, that he had turned around. We know from the physical evidence that is also true because he was shot once in the chest. We know for a fact that we see the glint of the handcuff with the claw threaded through because we can see that on the video. And we know that his hand is raised up. And that glint comes around in the first few seconds. If you watch, you can see that claw as he brings that because he is first sideways. What is the glint? The silver of the handcuff, you can see shining, a glint of the shininess of the handcuff, you can see is threaded through. So this is not an issue of having a cuff that's clasped together. And we do not have a case that talks about deadly weapons and handcuffs. The closest we have after this incident, but illustrative, is City of Tukalula v. Bond, where the court addressed the dangerousness of a suspect with a hammer in his hand, where the handcuff claw, and he was 20 feet away when the shots were fired in that garage. Here we are at a significantly shorter distance away, plus we have a handcuff that's jagged with the clawed end as well. I would just submit to the court that it is the plaintiff's burden to identify the clearly established law. And they have not done that. They have provided the court with a bunch of case law that occurred within the setting of a home in large part, which is fundamentally different, where you have a person who is contained and who largely is just suicidal. This was not a case of just someone being suicidal. The factor of the threat posed to the public is here in a way that it wasn't in the other cases. Counsel, you've exceeded your time. I don't want to cut you off in mid-sentence, so why don't you just wrap up. Thank you, Your Honor. I did cut you off in mid-sentence. Let's put three minutes on the clock for rebuttal. All right, thank you very much. I had just a couple rebuttal points that I wanted to bring, and then, of course, any additional questions. But the first would be talking a little bit about the dangling handcuff, because that did come up quite a bit. And I do want to distinguish the case law that we have, both on qualified immunity and as to the constitutional violation, the difference between a dangling handcuff as a weapon and instances, case law, that we see where there's a gun or a large butcher knife, things like Kinsella, where you see a large kitchen knife. And I think there is an important distinction to draw there, distinction between the dangerousness of that weapon and especially the range of that weapon. So a dangling handcuff sure can be swung, and it's metal and so on and so forth, but it's not a gun, and it's not even a knife. Is it fair to describe it as dangling in this case in the sense that at the time that the incident occurs, the testimony is, and the video certainly doesn't dispel this, that it's being grasped firmly so that it could be used in effect as a knife? It was dangling as he was running away. But was it dangling at the time of the incident? No, I believe that it is in his hand in the video. I think that it's potentially unfair to Mr. Andridge to give any particular intent as to what he was doing. I mean, that thing is swinging as he's walking. It could just be that he doesn't like it hitting his own arm as he's walking, and he's just holding it to stop moving. I don't know that we have evidence that he had the intent. No, I wasn't asking about that. I was just asking. It does seem to be undisputed that at that point he had grabbed it in his hand. I think it's fair to say that in the video it is in his hand. I don't know, as I said, I don't know that he had made the intention to use that as a weapon in that way or whether he's just holding it in his hand. And I think that the court is very accurate when you say that that very short video that we have, it's very difficult to see exactly how Mr. Andridge is positioned. It's important to note it's also taken in a rearview mirror, so it's also kind of funky in that it's the opposite of what you would expect to see. But I would note that as you're watching that video, Mr. Andridge's body and his feet continue to move away from Officer Costas. So the characterization that he's lunging at Officer Costas or that he's moving aggressively towards Officer Costas I think is a factual dispute that's important, especially on the qualified immunity cases, because on this particular factual scenario, the qualified immunity cases get very granular as to when the person is moving towards that officer, whether they are. And that is kind of where the qualified immunity analysis really turns. So the fact that we do not have very clear evidence as to Mr. Andridge's body movements, as to whether he turns and lunges is really important. Does the absence of clear evidence create a material fact dispute? I'm trying to figure out where the evidence is that he wasn't going towards him. So I think I think it's the video, Your Honor. I think that if you watch the video, you can see Mr. Andridge's kind of hips and feet, especially in his body, continue to move away from Mr. Costas as they kind of move down the roadway. He never does like a full lunge, if you will, as Officer Costas described it, where he kind of turns steps towards or into Officer Costas. He's moving away. So I think that the discussion of whether there is a lunge towards Officer Costas is an important factual dispute in this case, because it is really critical to the heart of the qualified immunity analysis. Thank you. Thank you. Both sides for their brief argument. And Judge Gould has a question. I'm sorry. Yes, I wanted to ask you, Pelham's counsel. Is it your position that the police in these circumstances and drawing all inferences in favor of your client had to let Andridge just walk away? No, I believe that there were many alternatives between those two extremes. So allowing him to walk freely into the community is one extreme on one hand. Shooting him dead is the other extreme. But this is a situation where we had multiple officers who were converging on foot into this area. We had a canine officer arriving. We had air support arriving. You had distance and time available to contain Mr. Andridge in a way that did not involve killing him. And so there is a middle of the road approach that would have been the appropriate solution in this case. And they did not need to resort to just allowing him free movement into the community either. Thank you, counsel. Judge Gould, do you have any other questions? Prematurely, thank you, but I'll thank you both again, both for your briefing and your arguments. And I want to thank counsel in this case and in the subsequent case for their flexibilities in rescheduling to meet the court's calendar. The next case on our calendar.
judges: GOULD, HURWITZ, BUMATAY